v Nikki Filicky. I'm going to give you 15 minutes to reply to the statement. Thank you, Court. My name is Karen Kale. I'm from Steptoe & Johnson and I have reserved five minutes for rebuttal. Please proceed. Your Honors, the District Court erred in concluding that the Eureka 6HA well was spud on a pooled unit that was different than the Smith A Unit A, in which some of Mrs. Filicky's leased acreage had been included pursuant to the declared pooled unit, or DPU, recorded on February 26, 2014 in Belmont County. The Smith 25, 2014, which was one day prior to the primary term of Mrs. Filicky's oil and gas lease ending. The District Court's opinion to the contrary should be reversed and the case should be remanded for proceedings consistent with that. The facts are undisputed and relatively straightforward. The original Filicky lease was entered into on September 26, 2006. The lease provided for annual delay rental payments if there was no drilling. So for several years, annual delay rental payments were made by the lessee to Mrs. Filicky. May 21, 2010, there was an additional lease. The primary term was extended. It now ran to September 26, 2014, and the pooling provision was changed in its entirety. As of February... I have a couple of questions that I would like you to expand on, if you would, please. The first relates to the effect of Ohio law in this case. Ohio law seems to say that the relevant pooled unit, and as I understand it here, while the permit for the first well, the Smith well, seems to be consistent with what you're claiming, or at least close, the permit for the Eureka well that you're basically saying saved this case has a different unit. Well, Your Honor, I disagree with the contention that the plat, which was given to ODNR with the Eureka 6HA well permit, describes a different unit than the Smith A unit A. Let me be more precise. The exact acres and boundaries are different in the Eureka and the Smith well permits, are they not? That's correct, Your Honor. So what do we make of that? I want you to ignore, for just a second, if you would, please, your close enough argument. It seems to me that if Ohio law says the unit that we're addressing is the unit in connection with the drilling permit, then the Eureka permit doesn't save you. Well, Your Honor, I could find nowhere in Ohio law that, nor in the Felicki lease, which of course is the controlling contract here, that requires a unit to be described with specificity. The lease itself talks about the... Wait a minute. The whole point of a unit is to decide whose property is in and whose property is out, and the point of that, of course, is to determine whether you get a share of the proceeds, how much it is, whether you can drill your own well on the property. So the boundaries here are important, right? Yes. So when you say there's nothing that says they have to be, what was your word, precise? Specific or precise. Why would you file one if it didn't include precise boundaries? Whether somebody is right on the edge in or right on the edge out is critically important in pooling, correct? Correct, but that's not the case here. The case here, and again, we're going back to the Felicki lease, and the phrase description of leased acreage, that is what her lease requires in terms of the DPU that must be recorded that put her on notice of that her land, part of her land, was included in a unit. And I would propose that I could not find in law in Ohio nor anywhere else a definition of description of leased acreage. I would propose... I gather under Ohio law your argument is the same as it is under the pooling clause, and that is close enough is good enough, and it doesn't make any difference because this property is inside no matter which of these drilling units you look at, right? Generally. Would your argument be the same if one person was inside in one and outside in the other? It would depend on that person's lease and what it required in terms of how you had to comply with the pooling provision. The second part of my question, maybe the more important one, is I don't see any temporal limit on when somebody then could file a new permit with a new pooling unit after the extended primary term had expired. You could carve somebody's properties right here, you can put them in this unit, this unit, this unit, this unit, you're always in a unit, but it's a vastly different unit and you could keep doing that forever. How would somebody at the end of, if I'm right about that, how would somebody at the end of, in this case, the extended primary term, ever know what they could do with their property? Well, I'm not sure if I followed that exactly and I'll do my best to answer it, Your Honor. In this particular case, Mrs. Flicky was put on notice that some of her acreage, initially it was 8 plus acres, was included in a declared pooled unit in Belmont County. Prior to the end of her primary term, a well was permitted and spud on that unit, a unit which included some of her acreage. Ultimately, when the lease went into production, she would receive her pro rata share as to her acreage and how it fit with the whole unit. So, as to Mrs. Flicky, the lease was extended into its primary term. The DPU itself, as well as her lease, permits reformations, reduction in size, increase in size of the unit. Wait a minute. For what period? Forever? I mean, this you don't declare, you don't file your unit for six more months. What if you decided to do this two years later? Would it still bind her? If her lease is being held, yes, as long as her lease is being held by production within the unit and it was held over to the secondary term, then as long as her lease is being held by production, then there's no time limit in her lease or in the DPU as to how often reformations or amendments can be made. As long as it's being held by production, that's the key. Kathleen's had a question. Well, I mean, you said that the DPU can reform this. I mean, the lease says to effect a reform, you need to file in the recorder's office a declaration that describes the pooled acreage, correct? Correct. So you need a declaration in order to reform. And the fact that your declaration, the DPU, I guess, that you filed here purports to reserve to you the right to change that instrument, I mean, surely that cannot change the party's rights under the contract. That you've unilaterally filed this thing doesn't mean they forfeit rights and you shed obligations under the contract. That's correct, Your Honor. But it goes back to Mrs. Felicki's lease and the pooling provision, which provides that units may be reduced, enlarged from time to time within the primary term or such term as, let me read it, let's see. Unless he is hereby given the right at its option at any time within the primary term hereof or at any time during which the lease may be extended by any provision hereof to pool, reform, enlarge, and or reduce such unit or pool. You have to follow this procedure, though. Correct. And you didn't, right? I mean, the declaration, it's just, I mean, you know, of the pooled acreage, you just don't have the right pooled acreage here. Actually, I mean, if we're talking acreage, it's a different amount of acres. What you're pointing to in a declaration on what you're trying to continue to lease here, isn't that fair? Well, I don't believe it is, Your Honor. It's the same pooled unit. It may not be exact, and that's the key. There has to be given, we believe, that the party's contemplated by not requiring a specific, precise description of the pooled unit in the lease. It's simply description of the leased acreage. That's present in the February 2014 DPU, and the same well pad was used. Of course, there's no limit on the number of wells in the lease, on how many wells you can put on a unit. It doesn't matter how you name the wells or what you name the unit. The issue is the unit and giving notice of the unit to Mrs. Felicki. That was the longest yellow I've ever seen. That's okay. That's okay. No, I appreciate your point. It's just usually when you file stuff with the recorder's office, it's usually in land interest, usually quite precise. But I understand your argument. Thank you. Good morning, Your Honors, and may it please the Court. I'm Ethan Vessels on behalf of Nikki Felicki. This Court should affirm the District Court's granting of summary judgment. I had a lot of prepared remarks, Your Honors, but you've already honed in on what I was going to say. This case comes down to one issue. What is the exact language of this lease and its addendum pertaining to the pooling declaration? I gather in this case that the Eureka well was completed and is producing? I don't know that to be true. I don't think it is, but I can't say if it's false either. I know that they spot it. I don't know that it was actually fracked. I don't know that it is. You know what? I take that back. You don't know whether your own client's getting money? I think she is. There were several wells mentioned, Your Honor. If we go to this whole Eureka issue, they drill a number of wells, the 6H, and there was a mention of a Pollock well. She is receiving royalties from the nine acres, which we've disputed and have not guessed. So what would happen here if we rule the way you're asking? She pays that money back and she's free to lease it out to somebody else? I don't think we should have to pay it back, but she would be free to lease it out. They're, in my estimation, literally wrongfully taking gas from her property. I don't think they owe her 12.5% of that gas. Now they owe her 100% of the gas. They have no lease on her property. It's leaseless right now. Her property, and we've filed an objection in the Ohio Department of Natural Resources. Let's talk about that for just a second, and I could be way off base here, but you're familiar with the rule of capture, right? Yes. The fact that somebody drills a well next to your property and takes all of your gas, absent some sort of either forced pooling or voluntary pooling, you just lose. Well, I have studied the law of capture, and we may be addressing it in this case in different proceedings. It is not entirely settled law, particularly within Ohio, if you are leaseless.  If you don't have a straw in the tank, you lose. So that's why you fight over pooling and forced pooling because that's precluding you from having your straw in the tank, so you want to be at least in the same situation you would be if you had a well. So all I'm trying to figure out is how do we unravel this? Well, Your Honor, if I may turn the question, and what you're really saying is if the court were to reverse here, Ms. Felicki, you're going to be stuck with a lease whether you want it or not. Even though your lease ended too bad, that's just how oil and gas works. You're going to be stuck in a pool for which you have a lease that is now expired. You thought it was going to end. It did end. And now you're stuck in something that's not your doing. How did you possibly derive that from my question? My question was, if you're right, how do we unravel this? I didn't say what was going to happen. I'm asking you to tell me what you want to happen here if we unravel this. All we're asking this court to do is affirm the district court's granting of summary judgment. The district court has already held that this lease is canceled. The cancellation has already been filed in the recorder's office in Belmont County. The land is currently without lease on it. And the Ohio Department of Natural Resources has exclusive jurisdiction over pooling issues. So whether this pool is still valid, that will be up to the Ohio Department of Natural Resources. And if they have to do a forced pooling proceeding involving Ms. Felicki, then that will be something separate. But that is not to be taken care of in either the state courts or the federal courts. That's for the Ohio Department of Natural Resources to take care of. I do want to talk about some things that were brought up in Ms. Cale's argument. In response to Judge Kethledge's question, he asked if it would be maybe it was Judge McCaig's question about a temporal limit. And that was something I was going to bring up. If the way that American Energy wants to do this is allowed to happen, then there would never be a time limit on how often they could file or just declare a pool, making leases go on forever. And Ms. Cale said, well, as long as it's held by production. Well, that's a key fact in this case. This lease was never held by production during the primary term. There was never a well drilled before the end of her lease that started producing oil or gas. Now, if that had happened, if the Smith A well had been drilled, fractured, and produced, and she started receiving royalties on that nine acres, her lease would have been held by production. It would have moved into the secondary term. And then if the lessee wanted to take another portion of her property and include it into a different unit, well, that's a whole different ballgame because the secondary term was in effect. That is not what we have here. We have a lease that never had a secondary term start because there was never a well that went into production during the primary term. And back to the first question of the day. You know, I'm not even sure that I follow you there. I would have read the pooling clause to say that sputting a well satisfies that requirement. The problem here was that the Smith well was dry or they discontinued it. That's right. And that brings up the second question. So there was a well sputted on this property before the termination of the extended primary term. That's correct, Your Honor. And that well didn't go into production. So what you're talking about is a separate savings clause called the— You just told me it did go into production earlier and that she'd been receiving royalties and that she was entitled to keep them. The Eureka well, which is a completely separate well, went into production after her lease was over. It was commenced before the end of the extended primary term. Now, whether that then serves to extend it is a different question. You said a minute ago there was no well that was producing before the expiration of the term. And all I'm pointing out to you is unless I'm misunderstanding the pooling clause, you have to spud that well. It doesn't have to actually be producing to extend the lease. Am I right about that? No, Your Honor. And that circles us back to the exact issue of why the district court canceled this lease is because she, Ms. Filikaty, was— What are the words, any well which is commenced or is drilled or is producing? What does that mean? Well, Your Honor, we have to look at three different clauses of the lease. The abendum clause, and you're looking at the drilling operations clause, in conjunction with the pooling clause. I'm asking you a very narrow question about the accuracy of what you said, and you want to expand it into these other clauses that I'm not asking you about. I can't answer the question without talking about all three clauses together, Your Honor, because if a well had been drilled on Ms. Filikaty's 168 acres, clearly the act of spudding, so long as it's done in good faith and continuously to a point of a producing well, that would hold the lease under the drilling operations clause. But if Ms. Filikaty had been properly included in a drilled production unit, a DPU, a declaration of unit, properly filed before the end of her term, and a well was drilled somewhere in that unit and spud, then yes, her lease would be held. But the issue of our case is that the Eureka unit was never recorded before the end of her lease. This well was drilled on someone else's property. That's why her lease ended. I hope that answered your question, Your Honor. It answers what you thought my question was, but let's go on to whatever else you want to talk about. Well, Your Honor, I'm here to help the court, so if you want to ask the question again, I'd like to. I don't. Okay. Well, again, Your Honor, this comes down to the precise language of the lease and its addendum involving reformations. And the lease in the amendment is absolutely clear that not only does the declaration of pooled unit have to be recorded, any reformations also must be recorded before the end of the primary term. Not only does it say that in the lease and its amendment, but when we took the deposition of the American Energy Eureka representative, they said, yes, that's what it says and that's what we understand it to mean. It must take place before the end of the primary term. So a reformation, so this argument that close enough is good enough is simply not part of the lease or its amendment. And I would note to the court that the argument at the trial court made by American Energy Eureka was that the lease and its amendment were ambiguous, which the court rejected. They did not argue substantial compliance. I looked carefully at the briefs. Substantial compliance wasn't their argument at the trial court. It was ambiguity. Only on appeal have they argued substantial compliance. So that's a new argument. And so we would contend it's a waived argument. Of course, even if it's not a waived argument, the law, particularly in Ohio but nationwide, is that substantial compliance is simply incompatible with oil and gas leasing, particularly as it pertains to the critical factors of when leases end. And I would point out the very recent case out of Ohio Sims v. Anderson where they made the same argument that the lease shouldn't end because we were only $8 short. It was a very unusual lease that they had to pay $400 per year in order to keep it going, the lessee. They got $392, only $8 and some change short. And the trial court held in favor of the lessee and said, well, that's close enough. And the court of appeals said, no, we don't use the close enough standard. Substantial compliance, whenever it's applicable, can only go to absolute trifling matters. And they said the $8 wasn't trifling. It had to do with the exact terms of that lease. We don't think we're anywhere close to a trivial or a trifling issue here, Your Honor. Having a lease end is an important matter to a lessor. They need to know when a lease ends and that's how they negotiate. Even if they don't know exactly how they're negotiating, many of these landowners don't, it's still important to the lessor and that's why they're written the way they are. All right, I really prefer to just answer questions, Your Honor, so absent further questions. All right, thank you. Ms. Gale, maybe you could respond to the substantial performance question right at the very beginning because we couldn't find that you had raised that below either. That is true. It was not raised below and on further reflection, it's probably not applicable here. Again, I think that kind of segues me to... So when you say it's not applicable here, I mean if you're conceding that you can't prevail on that argument because you didn't raise it below, then what are we left with? We're left with, Your Honor, a description. I would propose the definition for description of leased acreage as follows. The declared pool unit provides Mrs. Felicki with notice that some of her leased acreage is included in the pooled drilling unit, in this case the Smith A Unit A, rather than some requirement which is not in the lease that the declared unit contain an exact measure of the amount of her acreage included in that unit. That's not in the lease. You're under the pooling clause now? Correct. Where it says a declaration containing a description of the pooled acreage. That's the phrase? That's the phrase, Your Honor. So I had to say accurate description? Well, it doesn't... For that to be the case? Well, I don't think accurate would change the meaning either, Your Honor. Okay. Then it would just... I mean, it's implied, right? Description of the pooled acreage. I mean, isn't it implied that it's an accurate description and the acreage is actually the acreage we're talking about? And it was accurate. At the time it was filed, if you go forward, fast forward to March, which of course was March of 2015, which of course was after drilling began. One of the laterals went outside the boundary and there were some parcels that were not initially included. So there was a reformation, a modification, an amendment. The problem with that argument about how the lateral went outside the boundaries of the original pooled unit really seems to lose steam when you look at the drilling application, the permit application for the second well, which showed a different boundary. So at the time you spotted the second well, you already knew it was intended to relate to different acreage. I'll bet similar but different. Is that correct? Correct, Your Honor. So when you say a description of the pooled unit, I mean, you're not simply saying you could say, well, it's 40 acres to the east of the apple tree on Smith Road. No, Your Honor. So you have to define it by meets and bounds, right? Correct. I mean, that's what we do in real estate descriptions. So I don't see how a description of the pooled acreage can be anything other than whatever the pooled acreage is. Well, again, we're talking about Mrs. Felicki's lease and the requirements under her pooling provision in her lease. She was put on notice that a portion of her acreage was included in a unit, a pooling unit. I'm trying to figure out, are you saying a description of the pooled acreage relates to the description of the pooling unit or her acres that are within a pooled unit? Which are you arguing? Your Honor, I believe it relates to the entirety of the unit. Not her acres. But in a way, Your Honor, because in interpreting whether or not the lessee has complied with her lease, that's an issue we have to look at, and that's what we're looking at here. I believe that language, the description of pooled acreage, means that the entirety of the unit is to be described in the declared pooled unit. When a challenge is raised by one of the individual lessors, such as has been raised here, you need to then look at the language and what was included from her standpoint. Let me ask you if you could look at this a slightly other way as well. There are literally hundreds of different pooling clauses in the form books that relate to oil and gas leases, and some of them, as yours does, requires filing and some don't. So it seems to me the problem here, in terms of your argument, is that you used a clause in the extension of the lease that requires this filing of the declaration. If you hadn't used that, if you had used a more favorable to the lessee clause, we wouldn't be having this argument, right? I understand that. It certainly would make matters a lot easier. You're sort of bound by the language you picked. We are, Your Honor, but again, I believe that the language we picked complies with what occurred, that the Smith A. Unida adequately described the pooled acreage for purposes of the Eureka well, which was the second well, which was what held the lease and extended it into its second term. All right. Any questions? No. Thank you, Your Honors. Thank you. The case will be submitted.